# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HELLER'S GAS, INC., | : | No. 4:15-CV-01350 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| INTERNATIONAL INSURANCE | : | |
| COMPANY OF HANNOVER LTD, and | : | |
| INTERNATIONAL INSURANCE | : | |
| COMPANY OF HANNOVER SE | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### SEPTEMBER 18, 2017

Before the Court for disposition is Defendants International Insurance Company of Hannover Ltd. and International Insurance Company of Hannover SE's Motion for Summary Judgment. For the reasons discussed below, this Motion will be granted.

## I.    INTRODUCTION

Plaintiff Heller's Gas, Inc. ("Plaintiff") commenced this action on July 9, 2015 against Defendants International Insurance Company of Hannover Ltd. and International Insurance Company of Hannover SE ("Defendants"). In its Complaint, Plaintiff alleged claims for: (1) breach of contract, and (2) statutory bad

faith pursuant to 48 Pa.C.S.A. § 8371.[1]  Defendants filed an Answer on October

13, 2015,[2] and the parties thereafter commenced factual discovery.[3]  Following the

completion of discovery, Defendants filed a Motion for Summary Judgment

seeking the entry of final judgment in their favor on both claims.[4]  Parties then

briefed this Motion, and, following an unsuccessful attempt at mediation during

which time this Motion was stayed,[5] the matter is again ripe for my determination.[6]

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Heller's Gas, Inc. Constructs a Bulk Propane Storage Facility in Carlisle, PA.

Plaintiff Heller's Gas, Inc. owns and operates a property located at 1560

Holly Pike in Carlisle, Pennsylvania.[7]  In the summer and fall of 2011, Plaintiff

began developing this property as a bulk liquid storage facility.[8]  The "Project

Narrative" for this endeavor within Brehm-Lebo Engineering, Inc.'s ("Brehm-

Lebo") Post Construction Management Plan includes the following description:

---

[1]   ECF No. 1.

[2]   ECF No. 9.

[3]   ECF No. 14.

[4]   ECF No. 28.

[5]   ECF No. 52.

[6]   ECF Nos. 29, 36, and 38.

[7]   Defs.' Statement of Material Facts ("Defs.' SUMF")(ECF No. 28-2) ¶ 1, at 1; Pl.'s Resp. to Defs.' SUMF ("Pl.'s Resp.")(ECF No. 34) ¶ 1, at 1.

[8]   Defs.' SUMF ¶ 2, at 1; Pl.'s Resp ¶ 2, at 1.

Heller's Gas is proposing to operate a propane gas distribution center with retail store at 1560 Holly Pike (S.R. 0034), in South Middleton Township, Cumberland County. Proposed improvements will include expanding the existing service garage area with retail space, constructing a free standing storage garage for service vehicles, and the outdoor storage of bulk propane.[9]

Brehm-Lebo submitted these project plans to the LeTort Regional Authority Project Review Committee for approval.[10] In a letter dated September 24, 2011, the LeTort Regional Authority wrote the following concerning drainage on the property:

> 2. The existing conditions drawings show what appears to be a random stone-lined swale along the southern lot line leading to an enclosed depression, a sinkhole within the unlined portion of the swale at the enclosed depression, and a possible sinkhole within the stone lined portion of the swale. Recommend:
>
> a. That the plans clearly state that the existing sinkhole is to be repaired and that the suspected sinkhole is to be investigated and repaired if necessary.
>
> b. Relocating SWM Basin #1 to avoid concentrated infiltration of stormwater in the existing enclosed depression and sinkhole area to preclude the probable formation of a new sinkhole or the reopening of the existing sinkhole. The proposed location of Basin #1 is adequate for a detention basin provided that it is properly lined to preclude seepage.[11]

---

[9] Brehm-Lebo Engineering, Inc.'s Post Construction Management Plan (ECF No. 28-5), Exhibit B, at 5.

[10] Defs.' SUMF ¶ 3, at 2; Pl.'s Resp ¶ 3, at 2.

[11] September 24, 2011 Letter from LeTort Regional Authority (ECF No. 28-5), Exhibit D, at 1.

The Carlisle facility was completed and thereafter opened by Plaintiff in May 2013.[12] By October 11, 2013, the facility contained six large liquid propane storage tanks.[13] In a Status Report compiled by Adjuster Brad Powers, the location of these tanks is described as follows:

> The location manager mentioned that the parking lot slops (sic) towards the tanks, so all drainage from the parking lot goes to the tank storage area.[14]

**B. Defendants International Insurance Company of Hannover Ltd. and International Insurance Company of Hannover SE Issues an Insurance Policy to Plaintiff Covering this Carlisle Location.**

This new bulk propane storage facility was insured by Defendants for a policy period of May 28, 2013 through May 28, 2014.[15] This Policy covers "direct physical loss to covered property at a 'covered location' caused by a covered peril."[16] Concerning the ambit of "covered property," and pertinent to the instant action, the Policy contains the following provision:

> 10. Land, Water, and Growing Crops – "We" do not cover:
>
> > a. land, including but not limited to land on which the covered property is located;
> >
> > b. underground or surface water; or

---

[12] Defs.' SUMF ¶ 6, at 2; Pl.'s Resp ¶ 6, at 2.

[13] Defs.' SUMF ¶ 7, at 2; Pl.'s Resp ¶ 7, at 2.

[14] August 8, 2014 Status Report of Energi Risk Management (ECF No. 28-5), Exhibit F.

[15] Defs.' SUMF ¶ 10, at 3; Pl.'s Resp ¶ 10, at 3.

[16] ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 6 of 31).

c. growing crops.[17]

The Policy, furthermore, excludes coverage for a loss caused by an excluded

peril. This exclusion is encapsulated by the following language:

> "We" do not pay for loss or damage caused directly or indirectly by one
> or more of the following excluded causes or events. Such loss or damage
> is excluded regardless of other causes or events that contribute to or
> aggravate the loss, whether such causes or events act to produce the loss
> before, at the same time as, or after the excluded causes or events.[18]

The list of excluded perils includes both earth movement and flood exclusions.[19]

The Flood exclusion specifically states the following:

> "We" do not pay for loss caused by "flood." However, "we" do cover the
> resulting loss if fire, explosion, or sprinkler leakage results.[20]

Within the Definitions portion of the Policy, the term "flood" is defined as

including "surface water."[21]

The Policy nevertheless offers coverage for (1) sinkhole collapse, (2)

emergency removal expenses, and (3) income coverage loss as follows. First, the

Policy covers sinkhole collapse to covered property through the following

language:

> Collapse –"We" pay for loss caused by direct physical loss involving
> collapse as described in a., b., and c. below.

---

[17]  *Id.* at 8–9 of 31.

[18]  ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 17 of 31).

[19]  Defs.' SUMF ¶¶ 16–17, at 4; Pl.'s Resp ¶¶ 16–17, at 4.

[20]  ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 19 of 31).

[21]  *Id.* at 3 of 31.

a. Collapse of a building or structure, any part of a building or structure, or personal property inside a building or structure, if the collapse is caused by one or more of the following:

. . .

c. Collapse means a sudden and unexpected falling in or caving in of a building or structure or any portion of a building or structure with the result that the building or portion of the building cannot be occupied for its intended purpose.

d. The following are not considered to be in a state of collapse:

1) a building or structure that is standing or any portion of a building that is standing even if it displays evidence of bending, bulging, cracking, expansion, leaning, sagging, settling, or shrinkage;

2) a building or structure or any portion of a building structure in danger of falling in or caving; and

3) a portion of a building or structure that is standing even if it has separated from another portion of the building or structure.[22]

Second, the Policy offers under the "Emergency Removal Expenses" provision "up to $5,000 for "your" expenses to move or store covered property to prevent a loss caused by a covered peril."[23]  Third and finally, the Income Coverage Part of the Policy provides coverage "when 'your' 'business' is necessarily wholly or partially

---

[22]  *Id.* at 24 of 31.

[23]  *Id.* at 10 of 31.

interrupted by a direct physical loss of or damage to property at a 'covered

location.' "[24]  This coverage, however, is subject to the following condition:

> "We" pay no more than the Income Coverage "limit" indicated on the
> "schedule of coverages" for any one loss. Payments for earnings, extra
> expense, and "rents" combined does not exceed the "limit."[25]

The "Location Schedule in the instant policy, while including two entries for 1560

Holly Pike in Carlisle, Pennsylvania, contains no limit for either entry under the

column titled "BI/EE."[26]

### C.   On October 11, 2013, Plaintiff Notices Several Sinkholes Developing at the Base of the Propane Tanks.

Plaintiff first noticed sinkholes at the base of the propane tanks at the

Carlisle property on October 11, 2013, and filed a corresponding Property Loss

Notice on October 18, 2013.[27]  Plaintiff thereafter retained an engineering firm—

Navarro and Wright—to perform a site inspection on October 15, 2013.[28]  A

subsequently prepared report ("Navarro & Wright Report") relayed that "[t]he

sinkhole was reported to have opened sometime during or after the significant

rainfall event ending on Friday 10-11-13," and was the result of "[a] combination

of the natural geologic conditions, pour (sic) surface drainage, and ground

---

[24]   ECF No. 28-5, Exhibit H (Policy, Form CO 10010402, page 1 of 6).

[25]   *Id.* at 6 of 6.

[26]   ECF No. 28-5, Exhibit H (Policy, Form CO 10520402, page 1 of 1).

[27]   Property Loss Notice (ECF No. 28-6), Exhibit K.

[28]   *See* October 16, 2013 Navarro & Wright Consulting Engineers, Inc. Report (ECF No. 28-5), Exhibit G.

disturbances associated with the new construction."[29]  The Navarro & Wright

Report further detailed an Action Plan which included the following pertinent

steps:

> Temporary measures, such as plastic sheeting and diversion dikes should be installed to limit, to the greatest extent as reasonably achievable, the volume of surface water that might enter and accumulate on and around the tank farm pad and the adjacent concrete apron.[30]

> Heller's should consult with B-L regarding potential alterations to the current site stormwater drainage, **especially as it is related to the tank farm**. Ideally, water should flow freely off of the tank farm pad and should not accumulate in, or around, the pad. Consideration should be given to regrading of the pad and to the use of impermeable geosynthetic lining systems or pavements. N&W will remain available to explain the risks associated with the project as it evolves.[31]

The Report finally recommended that Plaintiff remove the liquid propane from the

tanks and relocate said tanks to prevent further damage.[32]   A copy of this Report

was forwarded to Defendants on October 18, 2013.[33]

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 3 of 4 (emphasis added).

[32] *Id.*

[33] Pl.'s Counterstatement of Material Facts ("Pl.'s CSMF")(ECF No. 35) ¶ 17, at 4.

**D.     Defendants Received Notice of the Reported Loss and, After Conducting An Investigation, Formally Denied Coverage on October 28, 2013.**

Upon receipt of both the Property Loss Notice and the Navarro and Wright Report, Defendants began investigating the reported loss with the assistance of its agent/broker Energi Insurance Services and its authorized claim representative, York Risk Services Group, Inc.[34]  On October 21, 2013, Stephen E. Toli, a Property Claims Examiner for York Risk Services Group, Inc., sent Plaintiff a Letter which expressed that, because coverage for the claim is "questionable" under the Policy, Defendants would be investigating "under a full reservation of all its rights."[35]  The letter also stated the following:

> International Insurance Company of Hannover Limited's coverage position is based on the information currently available to us. If you have any information that would alter our coverage position concerning this matter, please forward it to us for further evaluation. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the policy, or any other policies of insurance issued by International Insurance Company of Hannover Limited or any of its affiliates. International Insurance Company of Hannover Limited expressly reserves all of its rights under the policy, including the right to amend the above reservation of rights to include any additional grounds for disclaimer of coverage, including but not limited to those set forth above, if subsequent information indicates that such action is warranted.
>
> . . .

---

[34]  Defs.' SUMF ¶ 40, at 10; Pl.'s Resp. ¶ 40, at 9.

[35]  October 21, 2013 Letter from York Risk Services Group, Inc. to Plaintiff (ECF No. 28-6), Exhibit L.

Please realize that the International Insurance Company of Hannover Limited is not denying coverage at this time. If following our investigation, there continues to exist certain questions of coverage, you will be advised at that time.[36]

York Risk Services Group, Inc. thereafter conducted an investigation led by Brad Powers of Energi Insurance Services, Inc., and drafted a Letter dated October 28, 2013.[37] In this missive, Mr. Toli expressed that coverage would be denied based on the "Cost of Excavation," "Land, Water, and Growing Crops," and "Earth Movement Exclusions."[38] This letter again invited Plaintiff to forward additional information which would alter this position, and repeated that Defendants reserved the right to assert additional grounds for disclaimer of coverage.[39]

Plaintiff continued contesting this coverage determination, and on June 25, 2014, Energi representative Paul Nestor requested that the claim be reopened for purposes of allowing an "Emergency Removal Expense" under the policy.[40] Plaintiff was thereafter provided with a "Sworn Statement in Proof of Loss" form to sign on July 14, 2014.[41] This completed form for Emergency Removal Expenses was returned as dated September 8, 2014, and with recognition of the

---

[36] *Id.*

[37] October 28, 2013 Letter from York Risk Services Group, Inc. to Plaintiff (ECF No. 28-6), Exhibit P.

[38] *Id.*

[39] *Id.*

[40] June 25, 2014 Email from Paul Nestor to Stephen Toli (ECF No. 28-6), Exhibit Y.

[41] July 14, 2014 Email from Derek Zambino to Plaintiff (ECF No. 28-6), Exhibit Z.

$ 5,000 policy limit under this provision.[42]

### E. Plaintiff Unsuccessfully Seeks Reconsideration of the Coverage Denial, And Brings A Legal Action Against Defendants.

On August 5, 2014, Derek Zambino, insurance broker for Plaintiff, sent an email to Molly Ferrante of Energi Insurance Services, Inc. requesting that she clarify the applicability of certain provisions of the Policy.[43]  Mr. Zambino specifically wrote:

> I have been working with Paul Nestor with this and we both are in agreement with how we are handling this claim but the client is asking around for other opinions and it is causing confusion for them.
>
> I am looking for a legal interpretation on the policy language that I can use to help explain our decision.[44]

Ms. Ferrante thereafter responded addressing the inapplicability of each of the seven provisions cited within Mr. Zambino's email.[45]

Eric Quinlan, Esquire, claims counsel for Energi Insurance Services, Inc., sent an email on February 12, 2015 to Mr. Zambino.[46]  In this email, Mr. Quinlan expressed that, while Energi had "made a decision to forfeit the $ 5,000.00 we have put up in an effort to get Heller's the largest recovery," Energi would not be

---

[42] Sworn Statement in Proof of Loss (ECF No. 28-6), Exhibit AA.

[43] August 5, 2014 Email from Derek Zambino to Molly Ferrante (ECF No. 28-6), Exhibit BB.

[44] *Id.*

[45] *See* August 22, 2014 Email from Molly Ferrante to Derek Zambino (ECF No. 28-6), Exhibit CC.

[46] February 12, 2015 Email from Eric Quinlan, Esq. of Energi Insurance Services, Inc. to Derek Zambino (ECF No. 28-6), Exhibit DD.

abandoning their case, but rather would work with Plaintiff's newly retained counsel to secure a recovery against the engineering firm responsible for the faulty design of the tank farm.[47] Mr. Quinlan thereafter facilitated contact between Plaintiff's counsel and Mr. Zambino.[48]

On April 15, 2015, Plaintiff's counsel sent a Letter to Mr. Quinlan requesting a formal coverage opinion concerning coverage for the extent of loss previously detailed in the Sworn Statement in Proof of Loss.[49] Counsel for Defendants thereafter responded on May 22, 2015 in an eight page letter discrediting Plaintiff's argument for coverage through both the operation of the anti-concurrent clause and exclusions, and the inapplicability of numerous coverage extensions.[50] Like previous denials, this Letter concluded with the following pertinent language:

> Hannover reserves all rights to assert, and shall not be estopped from asserting, any and all defenses under the policy and/or law. This correspondence is therefore not intended as a waiver, modification, or alteration of any of the terms, conditions, limitations, endorsements or exclusions of the subject policy.[51]

---

[47] *Id.*

[48] *See* ECF No. 28-6, Exhibit EE.

[49] April 15, 2015 Letter from Plaintiff's Counsel to Eric Quinlan (ECF No. 28-6), Exhibit FF.

[50] May 22, 2015 Letter from Defendants' Counsel to Plaintiff's Counsel (ECF No. 28-7), Exhibit HH.

[51] *Id.*

Unhappy with this affirmation of prior coverage determinations, Plaintiff filed suit against Defendants on July 9, 2015.[52]

## III. LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[53] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[55]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[56] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[57] The letter further requested

---

[52]   ECF No. 1.

[53]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[54]   Fed. R. Civ. P. 56(a).

[55]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex Corp.*, 477 U.S. at 322).

[56]   *Clark*, 9 F.3d at 326.

[57]   *Id.*

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[58] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[59] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[60] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[61] Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[58] *Liberty Lobby, Inc.*, 477 U.S. at 252.

[59] *Id.*

[60] *Id.*

[61] *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the

absence of a genuine issue of material fact."[62] "[R]egardless of whether the

moving party accompanies its summary judgment motion with affidavits, the

motion may, and should, be granted so long as whatever is before the district court

demonstrates that the standard for the entry of summary judgment, as set forth in

Rule 56(c), is satisfied."[63]

Where the movant properly supports his motion, the nonmoving party, to

avoid summary judgment, must answer by setting forth "genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party."[64] For movants and nonmovants alike, the

assertion "that a fact cannot be or is genuinely disputed" must be supported by:

(i) "citing to particular parts of materials in the record" that go beyond "mere

allegations"; (ii) "showing that the materials cited do not establish the absence or

presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot

produce admissible evidence to support the fact."[65]

---

[62] *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted).

[63] *Id.*

[64] *Liberty Lobby, Inc.*, 477 U.S. at 250.

[65] Fed. R. Civ. P. 56(c)(1).

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[66] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[67] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[68]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[69] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[70] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[71]

---

[66] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[67] Fed. R. Civ. P. 56(e)(2).

[68] Fed. R. Civ. P. 56(c)(3).

[69] *Liberty Lobby, Inc.*, 477 U.S. at 249.

[70] *Id.*

[71] *Id.* at 249–50 (internal citations omitted).

## IV. ANALYSIS

In their Motion for Summary Judgment, Defendants seek the entry of summary judgment on Plaintiff's breach of contract and statutory bad faith claims. Having reviewed the factual record of this case in conjunction with applicable Pennsylvania contract interpretation principles, I find that no genuine dispute of material fact precludes this result. My reasoning is as follows.

### A. Breach of Contract Claim

To sustain a cause of action for breach of contract, a plaintiff must establish: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by that contract; and (3) resultant damages.[72] In the context of insurance contracts, the United States Court of Appeals for the Third Circuit has stated the following:

> [t]he task of interpreting an insurance contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.[73]

---

[72] *See CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super. Ct. 1999).

[73] *Regents of Mercersburg College v. Republic Franklin Ins. Co.*, 458 F.3d 159, 171 (3d Cir. 2006).

"A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them."[74] As a practical matter, the initial burden of establishing coverage under an insurance policy rests with the insured; however, the insurer then bears the burden of establishing the applicability of an exclusion under an insurance policy.[75]

### 1.    Direct Physical Loss

In their Motion and its accompanying papers, Defendants first argue that summary judgment is appropriate here because Plaintiff did not suffer "direct physical loss" to covered property—in this case, the propane storage tanks.[76] Defendants specifically advance that, while the damage to the land upon which the tanks sat is undeniable, such damage is not covered and the costs of filling/backfilling would be allowable only to the extent necessary to repair underground covered property.[77] Damage to the tanks themselves—property covered by the Policy—was limited to a single, above ground pipe whose value was soundly within the policy deductible.[78] The mere "leaning, sagging, or

---

[74] *St. Paul Fire and Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981).

[75] *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206 (3d Cir. 2001).

[76] Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.")(ECF No. 29), at 5.

[77] *See* Defs.' Br. at 11 (quoting ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 8 of 31)).

[78] Defs.' Br. at 6.

settling" of the tanks, Defendants argue, does not constitute "collapse" within the "Other Coverages" section, or trigger Policy coverage.[79]

Plaintiff, of course, resists the issuance of summary judgment on this ground by arguing that the covered property— here the propane tanks—either suffered a direct physical loss triggering coverage, or was nevertheless "at risk" for a greater physical loss due to the state of the tanks after October 11, 2013, but prior to remediation.[80]  Specifically, Plaintiff avers that uncontroverted evidence of "sinking tanks, sinking tank supports, bent pipes, and damaged pylons" constitutes "direct physical loss" triggering coverage under the following Policy provision:

> 13. Underground Pipes, Pilings, Bridges, and Roadways – "We" cover direct physical loss caused by a covered peril to:
>
> a.    pilings, piers, wharves, docks, or retaining walls;
> b.    underground pipes, flues, or drains; and
> c.    bridges, walkways, roadways, and other paved surfaces.
>
> The most "we" pay under this Supplemental Coverage in any one occurrence or at any one "covered location" is $250,000.[81]

Having established direct physical loss to a component of the storage tanks, Plaintiff next cites the following provision to mandate coverage to the full extent of damages suffered:

---

[79]  *Id.* at 10 (citing ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 24 of 31)).

[80]  Pl.'s Br. in Opp. ("Pl.'s Br.") (ECF No. 36), at 6.

[81]  *Id.* at 20 (citing Policy, Form CO 10001002, page 14 of 31)).

> "We" do not cover the cost of excavations, grading, filling, of backfilling. However, if a covered loss occurs to covered property below the surface of the ground, "we" cover costs that are a necessary part of the repairing, rebuilding, or replacement of the property.[82]

Finally, Plaintiff avers that coverage is itself recognized by Defendants who paid $5,000 under the "Emergency Removal Expenses" coverage extension.[83]

In the alternative, Plaintiff argues that "direct physical loss" to the covered property occurred because the sinkhole opening rendered the tanks unusable.[84] To support this "loss of use" argument, Plaintiff cites the Third Circuit cases of *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2005) and its progeny, *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x. 823 (3d Cir. 2005). In *Port Authority*, the Third Circuit held that the plaintiff could recover for losses stemming from asbestos contamination of a building only if the cause of the harm " 'has resulted in contamination of the property such that its function is nearly eliminated or destroyed or the structure is made useless or uninhabitable . . . ' "[85] While the Third Circuit found that such "loss of use" was not present in *Port Authority*, the Court later held, in *Motorists Mutual Ins. Co.,*

---

[82]  Pl.'s Br. at 20 (citing Policy, Form CO 10001002, page 8 of 31)).

[83]  *Id.* at 14.

[84]  *Id.* at 11.

[85]  311 F.3d at 236.

that the bacteria contamination of a home's water supply constituted a "direct physical loss" under Pennsylvania law when it rendered the home uninhabitable.[86]

I find Plaintiff's arguments concerning the presence of "direct physical loss" to covered property in this instance unavailing. Here, as previously noted, the Policy covers "direct physical loss to covered property at a 'covered location' caused by a covered peril."[87] In order to trigger coverage, Plaintiff has the burden of establishing that its covered property was damaged.[88] This burden has not been met for two reasons. First, I find coverage under the "Underground Pipes, Pilings, Bridges, and Roadways" provision for the extent of damage sustained is not triggered based solely on damage to a single pipe. I specifically agree with Defendants that, despite the averments of Plaintiff, there is no evidence within the factual record which demonstrates damage to such property **underground**. This provision is therefore inapplicable. Indeed, photos of the storage tanks at issue clearly and indisputably show both (1) the deflected pipe above ground, and (2) the undamaged status of the pylons.

---

[86]   131 F.App'x. at 825–27.

[87]   ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 6 of 31).

[88]   *Port Authority*, 311 F.3d at 232 (citing *Koppers Co. v. Aetna Cas. & Surety Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)).

Figure 1: Picture of Deflected Pipe[89]





Furthermore, even assuming the applicability of the "Underground Pipes, Pilings, Bridges, and Roadways" provision, I am nevertheless in agreement with Defendants that the plain and unambiguous language of the provision covers "direct physical loss caused by a covered peril to . . . pilings, piers, wharves, docks, or retaining walls," and cannot be construed to extend to the damages sought by Plaintiff—costs of the removal of the tanks *in toto* and remediation of the land.

---

[90]   *Id.* at 8.

Such an interpretation would, in my view, torture the language of this provision to create an ambiguity in the scope of coverage afforded by the Policy.[91]

Finally, contrary to the assertion of Plaintiff, Defendants' payment of $ 5,000 under the "Emergency Removal Coverage Extension" does not trigger coverage for the damages sustained.  This provision states the following:

> 4. Emergency Removal Expenses –"We" pay **up to $5,000** for "your" expenses to move or store covered property **to prevent a loss** caused by a covered peril. This coverage applies for up to 365 days after the property is first moved, but does not extend past the date on which this policy expires.[92]

Again, the plain language of this provision does not indicate that payment under its auspices necessarily implicates the presence of a "direct physical loss."  Rather, the wording of this provision and purpose of this section is **to prevent a potential** loss caused by a covered peril.  Given that the covered property at issue—the propane tanks—contained flammable material, their state *post* October 11, 2013 presented just that—a potential loss.

Having found no physical damage to the covered property sufficient to trigger coverage, the success of Plaintiff's claim is therefore dependent on a novel argument that the alleged inoperability of the propane tanks *post* October 11, 2013

---

[91] *T.H.E. Ins. Co. v. Charles Boyer Children's Trust*, 455 F.Supp.2d 284, 289 (M.D.Pa. 2006)(Vanaskie, J.)(quoting *St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981)("A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them.").

[92] ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 10 of 31)(emphasis added).

constitutes "direct physical loss." I find this argument both unpersuasive and unsupported by law.

As I noted above, Plaintiff advances this argument pursuant to *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2005) and *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x. 823 (3d Cir. 2005). Application of these cases to the instant matter, however, is an attempt by Plaintiff to fit the proverbial square peg in a round hole. Specifically, in both of these cases, the Third Circuit was confronted with the discrete issue of whether **covered property** rendered uninhabitable **by dangerous gases or bacteria** constituted "direct physical loss or damage" sufficient to trigger coverage. These cases did not address whether a non-gaseous or bacterial related condition on **noncovered property**—in this case, supporting land— can constitute physical loss on covered property if it renders such property unusable. Indeed, the line of cases in this Circuit following these decisions has not extended nor interpreted their applicability to this broad a reach.[93] I will not act to extend it today.

Second, and equally dispositive, is a factual difference between the instant Policy and that in *Motorists Mutual Ins. Co.* Specifically, the definition of

---

[93] *See, e.g., Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America*, Civil Action No. 12-CV-04418, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014)(finding that an unsafe amount of the chemical ammonia rendered a facility unusable and thus constituted a direct physical loss); *Bragg v. Taylor*, Civil Action No. 12-CV-7219, 2013 WL 1214971, at *2 (E.D.Pa. Oct. 29, 2013)(recognizing that *Port Authority* and *Motorists Mutual* involved damage from unconventional sources difficult to measure).

property damage within *Motorists Mutual Ins. Co.* policy included "physical injury to, destruction of, or **loss of use** of tangible property."[94] This expansive view of property damage is absent in the instant policy. Rather, any damages stemming from loss of use would be compensable under the Income Coverage Part of the instant Policy, which states:

> "We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.[95]

Plaintiff, however, declined to purchase this additional coverage for its Carlisle location.[96] Indeed, the "Location Schedule in the instant policy, while including two entries for 1560 Holly Pike in Carlisle, Pennsylvania, contains no limit for either entry under the column titled "BI/EE."[97]

In sum, based on the undisputed facts and the foregoing analysis which finds that Plaintiff's covered property has not sustained "direct physical loss" necessary to trigger coverage, I find that summary judgment is warranted in favor of Defendants on this ground alone.

---

[94]   131 F. App'x. at 825 n. 2 (emphasis added).

[95]   ECF No. 28-5, Exhibit H (Policy, Form CO 10010402, page 1 of 6).

[96]   *See* ECF No. 28-5, Exhibit H (Policy, Form CO 10520402, page 1 of 1).

[97]   ECF No. 28-5, Exhibit H (Policy, Form CO 10520402, page 1 of 1).

## 2. Flood Exclusion

Assuming *arguendo* that the covered property—the six propane tanks at issue sustained "direct physical loss" necessary to trigger policy coverage for the sustained damages, I hold that coverage would nevertheless be precluded pursuant to the Policy's flood exclusion.

The Flood Exclusion Provision provides the following:

> "We" do not pay for loss or damage caused **directly or indirectly** by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same times as, or after the excluded causes or events.
>
> . . .
>
> f. Flood – "We" do not pay for loss caused by "flood". However, "we" do cover the resulting loss if fire, explosion, or sprinkler leakage results.[98]

Within the Policy in the Definitions section, "Flood" is in turn defined as:

> [F]lood, **surface water**, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not. This includes spray that results from any of these whether driven by wind or not.[99]

In their Motion for Summary Judgment, Defendants argue the applicability of this exclusion together with the above anti-concurrent causation lead-in language precludes coverage for the damages sought.[100]

---

[98] *See* ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 18–19 of 31)(emphasis added).

[99] *Id.* at 3 of 31 (emphasis added).

Plaintiff contests this conclusion with three arguments. First, Plaintiff argues that Defendants failed to raise this argument at the time of denial of coverage and are therefore precluded from advancing it now.[101] Second, Plaintiff argues that this exclusion is inapplicable because there is no evidence supporting the presence of "surface water" as defined within the policy.[102] Third, and apparently in the alternative,[103] Plaintiff argues that, while weather would normally be an excluded condition, the effects of the rainfall are covered to the extent they result in a covered peril, such as sinkhole collapse.[104]

First, to the extent Plaintiff argues that the application of this flood exclusion is somehow estopped by Defendants failure to invoke it in their initial denial of coverage on October 28, 2013, I note that the factual record does not support this claimed waiver by Defendants. Indeed, in the declination letter cited by Plaintiff, counsel for Defendants wrote the following:

---

[100] Defs.' Br. at 14.

[101] Pl.'s Br. at 14–15.

[102] *Id.* at 16–17.

[103] I note "in the alternative" because, despite Defendants' production of a NOAA Certified Quality Controlled Local Climatological Data Sheet indicating that Harrisburg received nearly ten inches of rain on October 10-11, 2013, Plaintiff contests the relevance of this data for showing rainfall totals at the Carlisle tank farm. Defs.' SUMF ¶ 27, at 7; Pl.'s Resp. ¶ 27, at 6. This argument, however, now asks the Court to accept as undisputed fact significant rainfall during this period. This fact is established by Plaintiff's own engineering study—the Navarro & Wright Report. *See* October 16, 2013 Navarro & Wright Consulting Engineers, Inc. Report (ECF No. 28-5), Exhibit G.

[104] *Id.* at 18.

This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the policy, or any other policies of insurance issues by International Insurance Company of Hannover Limited or any of its affiliates. **International Insurance Company of Hannover Limited expressly reserves all of its rights under the policy, including the right to amend the above reservation of rights to include any additional grounds for disclaimer of coverage**, including but not limited to those set forth above, if subsequent information indicates that such action is warranted.[105]

This admonition was repeated in Defendants' formal May 22, 2015 Letter expressing their coverage position.[106] Furthermore, while Plaintiff cites the non-binding cases of *Trunzo v. Allstate Ins. Co.*[107] and *Hollock v. Erie Ins. Co.*,[108] my analysis reveals these cases to be inapposite. The dispute within the *Trunzo* case concerned both whether the insured constituted an "insured person" and whether the car she was driving was an "insured auto" within the context of an **auto policy**.[109] Furthermore, the *Hollock* case was outside the context of a policy's coverage and was instead limited to bad faith analysis.[110] These cases are not persuasive.

---

[105] *See* October 28, 2013 Letter from York Risk Services Group to Hellers Gas Company, Inc. (ECF No. 36-6)(emphasis added).

[106] May 22, 2015 Letter from Defendants' Counsel to Plaintiff's Counsel (ECF No. 28-7), Exhibit HH.

[107] Civil Action No. 04-CV-1789, 2006 WL 2773468 (W.D.Pa. Sept. 25, 2006).

[108] 842 A.2d 409 (Pa. Super. Ct. 2004).

[109] *Trunzo*, 2006 WL 2773468, at *11.

[110] *Hollock*, 842 A.2d at 412.

Second, while Plaintiff contests the applicability of the flood exclusion by arguing that there is no evidence of an accumulation of "surface water" within the policy, that averment is unsupported, and in fact contradicted, by a full reading of the factual record. Specifically, the engineering report of Navarro & Wright is replete with references to rainfall/surface water contributing to the opening of the sinkhole. These references include the following:

> One (1) apparent sinkhole opening at the ground surface was observed to the north of Tank 2 and extending below the concrete apron pavement. The sinkhole was reported to have opened **sometime during or after the significant rainfall** ending on Friday 10-11-13.[111]
>
> . . .
>
> A combination of natural geologic conditions, **pour (sic) surface drainage**, and ground disturbances associated with the new construction have provided a catalyst form the formation of the observed sinkholes and closed depressions.[112]

Furthermore, in recommending remedial measures, the Report recognized the necessity of addressing stormwater drainage on the tank farm in the following passages:

> Temporary measures, such as plastic sheeting and diversion dikes should be installed to limit, to the greatest extent as reasonably achievable, the volume of surface water that might enter and

---

[111] *See* ECF No. 28-5, Exhibit G (October 16, 2013 Navarro & Wright Consulting Engineers, Inc. Report, page 2 of 4)(emphasis added).

[112] *Id.* (emphasis added).

accumulate on and around the tank farm pad and the adjacent concrete apron.[113]

Heller's should consult with B-L regarding potential alterations to the current site stormwater drainage, **especially as it is related to the tank farm**. Ideally, water should flow freely off of the tank farm pad and should not accumulate in, or around, the pad. Consideration should be given to regrading of the pad and to the use of impermeable geosynthetic lining systems or pavements. N&W will remain available to explain the risks associated with the project as it evolves.[114]

Third and finally, Plaintiff argues that while loss caused by weather conditions is normally excluded from the ambit of this policy, its contribution to a covered peril—sinkhole collapse— necessarily mandates coverage per the language of the Policy.[115]  This recognition of rain and therefore surface water's effect in causing the instant loss implicates the anti-concurrent causation language of this Policy, and is ultimately damning to Plaintiff's argument.  This language states the following:

"We" do not pay for loss or damage caused **directly or indirectly** by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.[116]

---

[113]  *Id.*

[114]  *Id.* at 3 of 4 (emphasis added).

[115]  Pl.'s Br. at 18 (quoting Policy, Form CO 10001002, page 22 of 31).

[116]  *See* ECF No. 28-5, Exhibit H (Policy, Form CO 10001002, page 18 of 31).

The explicit inclusion of this language negates the default "efficient proximate cause" doctrine under Pennsylvania law.[117]

The conjunctive effect of this anti-concurrent causation language and the flood exclusion[118] precludes coverage of the damages sought regardless of other covered perils. While Plaintiff resists this conclusion by arguing both that the surface water did not directly cause the damages at issue and that the policy language itself is ambiguous, I note that these arguments were previously raised and rejected by the Court in *T.H.E. Ins. Co. v. Charles Boyer Children's Trust*.[119] In that case, the Honorable Thomas I. Vanaskie, formerly of this Court, wrote

> [I]t must be concluded that the damage in question was caused, directly or indirectly, by surface water. That a covered risk may have contributed to the loss is irrelevant in light of the clear language of the lead-in clause."[120]

Judge Vanaskie therefore held that "the surface water exclusion and the lead-in clause unambiguously combine to exclude the loss at issue from coverage under the Policy."[121] Appealing the entry of summary judgment in favored of insured on

---

[117] *Colella v. State Farm Fire & Cas. Co.*, 407 F. App'x. 616, 622 (3d Cir. 2011).

[118] Furthermore, while Plaintiff argues that it purchased Deluxe Coverage Extensions providing coverage for a loss caused by surface water (Pl.'s Br. at 16 (citing Policy, Energi Deluxe Coverage Extensions, page 2 of 5), it has not adduced that any of its petroleum product was rendered unusable as required by this provision. *See* ECF No. 28-5, Exhibit E, Interrogatory Number 10.

[119] 455 F. Supp. 2d at 298.

[120] *Id.*

[121] *Id.*

this ground, the plaintiff in *T.H.E. Ins. Co.* argued before the Third Circuit that the "surface water exclusion is ambiguous rather than specific."[122]  Our Court of Appeals rejected that argument, noting that "the term "surface water" has a clear definition under Pennsylvania and Third Circuit law" and that "[a]bsent ambiguity and given an applicable exclusion, [plaintiff] cannot benefit from the all-risk nature of its policy from T.H.E."[123]

Here, as noted above, the undisputed facts demonstrate that the accumulation of surface water contributed at the very least *indirectly* to the damages at issue.  Therefore, given the unambiguous definition of "surface water" within this jurisdiction and the operation of the anti-concurrent causation lead-in clause, I am satisfied that the language of the Policy is unambiguous, the issue presented is beyond dispute, and coverage in the instant matter is thus precluded.[124] Summary judgment is therefore appropriate in Defendants' favor based on this alternative conclusion.

---

[122] 269 F. App'x. 220, 223 (3d Cir. 2008).

[123] *Id.*

[124] *Accord Gillin v. Universal Underwriters Ins. Co.*, Civil Action No. 09-CV-5855, 2011 780744, at *8 (E.D.Pa. Mar. 4, 2011) (granting summary judgment in favor of the insurer where coverage for damages "unambiguously precluded" by the lead-in clause and the e earth movement, cracking and collapse exclusions); *Pisano v. Nationwide Mut. Fire Ins. Co.*, Civil Action No. 08-CV-2524, at *5 (E.D.Pa. Oct. 21, 2009)(granting summary judgment in favor of the insurer where coverage for damages was precluded by the lead in clause of policy and the presence of an excluded peril); *Baker v. Metropolitan Property and Cas. Ins. Co.*, Civil Action No. 12-CV-01231, 2013 WL 5308196 at *3 (M.D.Pa. Sept 19, 2013)(Mariani, J.)(finding that the "lead-in" clause of the insurance policy bars coverage for excluded events regardless of their cause).

## B. Bad Faith Claim

A plaintiff asserting an insurance bad faith claim under 42 Pa. C. S.A. § 8371[125] must demonstrate by clear and convincing evidence that: 1) the insurer lacked a reasonable basis for its handling of a claim; and, 2) the insurer knew of or recklessly disregarded the lack of a reasonable basis.[126] "[T]he essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits."[127] Bad faith conduct "imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith."[128]

In opposing a summary judgment motion on this claim, courts "must view the evidence presented in light of the [insured's] substantive burden at trial."[129] Accordingly, on summary judgment the plaintiff must present evidence such that a

---

[125] The text of the statute reads:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interests plus 3%.
> >
> > (2) Award punitive damages against the insurer.
> >
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.

[126] *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011).

[127] *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 506 (3d Cir. 2004).

[128] *Terletsky v. Prudential Prop. & Cas. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)) (internal citations omitted).

[129] *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (internal quotations and citations omitted).

reasonable jury could find bad faith "by the stringent level of clear and convincing evidence."[130] "This heightened standard requires the insured to provide evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith."[131] Where a plaintiff fails to offer clear and convincing evidence of bad faith for summary judgment, the plaintiff's claim is properly withheld from the jury.[132]

An insurer may defeat a bad faith claim by showing it had a reasonable basis for its actions.[133] The insurer may do so by demonstrating that it conducted a sufficiently thorough review or investigation used as a foundation for its subsequent decisions.[134] The insurer need not show that its investigation "yielded the correct conclusion or even that its conclusion more likely than not was accurate," only that its actions were reasonable.[135]

In the instant matter, my analysis of Plaintiff's bad faith claim is necessarily short given both the above failure of its breach contract claim, and Plaintiff's failure to show bad faith by clear and convincing evidence. At the outset, I note

---

[130] *Verdetto v. State Farm Fire and Cas. Co.*, 837 F. Supp. 2d 480, 484 (M.D. Pa. 2011) (Caputo, J.) (internal quotations and citations omitted).

[131] *Amica*, 656 F.3d at 179 (internal quotations and citation omitted).

[132] *See Oehlmann v. Metro. Life Ins. Co.*, 644 F. Supp. 2d 521, 528–29 (M.D. Pa. 2007) (Kosik, J.).

[133] *Amica*, 656 F.3d at 179.

[134] *See Foster v. Westchester Fire Ins. Co.*, Civil Action No. 09-1459, 2011 WL 4382971, at *13 (W.D. Pa. Sept. 20, 2011).

[135] *Id.*

that summary judgment is appropriate on this claim given the failure of the breach of the contract claim.[136] Furthermore, even if the failure of Plaintiff's breach of contract claim were not outcome determinative, the exacting standard which Plaintiff must meet at trial on his bad faith claim, and its failure to present a scintilla of evidence to that end, dictates the entry of summary judgement in Defendants' favor.[137]

First, upon review of the factual record, I find that no reasonable jury could conclude by clear and convincing evidence that a reasonable basis for denial of coverage was lacking given the complexity of the coverage issue presented.[138] Beyond the determination made repeatedly, and in this Court's view—correctly— by Defendants, Plaintiff's own broker, Derek Zambino, in the face of his staff's concurrence with this result, vowed to "work my relationships" to "get 'something' covered."[139] He later requested from Molly Ferrante of Energi Insurance Services,

---

[136] *Gold v. State Farm Fire & Cas. Co.*, 880 F.Supp.2d 587, 597 (E.D.Pa. 2012)("Resolution of a coverage claim on the merits in favor of the insurer requires dismissal of a bad faith claim premised on the denial of coverage, because under the circumstances the insurer necessarily has a reasonable basis for denying benefits.")(citing *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir.1999); *Treadways, LLC v. Travelers Indem. Co.*, 467 F.App'x. 143, 146–47 (3d Cir. 2012); *Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 249 F.Supp.2d 569, 570 n. 1 (E.D.Pa. 2003)).

[137] *Babayan*, 430 F.3d at 137.

[138] **Error! Main Document Only.***See Amica*, 656 F.3d at 179.

[139] *See* ECF No. 28-6, Exhibit U (April 2, 2014 Email from Derek Zambino)(emphasis added).

Inc. "a legal interpretation on the policy language that I can use to help explain **our decision**."[140]

Furthermore, evidence is lacking in the factual record to show by clear and convincing evidence that the denial of coverage was made with knowledge or reckless disregard by Defendants. Plaintiff contends that this burden is met through a continually evolving narrative of why coverage was being denied.[141] This narrative, however, fails to cite any evidence showing the ill motive or recklessness necessary to succeed on this claim. Specifically, while Plaintiff attempts to demonstrate a predetermined decision to deny benefits through the alacrity of the claim review process, I nevertheless note the absence of evidence supporting this supposition.[142] Rather, full review of the factual record demonstrates the following. First, Defendants' decision to deny coverage was consistent throughout the review process, and was always accompanied by an invitation to Plaintiff to supplement the record with information which could alter this conclusion.[143] Second, while denying their obligation to indemnify the extent

---

[140] *Id.*

[141] Pl.'s Br. at 23–31.

[142] *Foster v. Westchester Fire Ins. Co.*, Civil Action No. 09-CV-1459, 2011 WL 4582971, at *14 (W.D.Pa. Sept. 20, 2011)("Plaintiff, bearing the burden of proof at trial with respect to establishing the essential elements of a bad faith claim, cannot rest solely upon his allegations to defeat defendants' motion for summary judgment as to this claim.").

[143] *See, e.g.,* October 21, 2013 Letter from York Risk Services Group, Inc. to Plaintiff (ECF No. 28-6), Exhibit L; October 28, 2013 Letter from York Risk Services Group, Inc. to Plaintiff

of loss suffered, Defendants nevertheless assisted Plaintiff in a potential third party claim against the engineer responsible for the tank farm's faulty design by recommending an attorney and offering the resources of its own litigation department.[144] Third, following an initial denial of coverage, Defendants reconsidered their decision and in fact provided some coverage under the Emergency Removal Expense provision.[145]

Here, Plaintiff's statutory bad faith claim necessarily fails given the dismissal of the underlying breach of contract claim. Furthermore, the undisputed facts of record demonstrate both that Defendants had a reasonable basis for their coverage denial and Plaintiff nevertheless failed to offer evidence from which a reasonable jury could find bad faith by a clear and convincing standard. Consequently, Plaintiff's bad faith claim is properly dismissed on summary judgment.

## V.    CONCLUSION

Finding no genuine disputes of material fact precluding such a result, I will grant Defendants International Insurance Company of Hannover Ltd. and

---

(ECF No. 28-6), Exhibit P; May 22, 2015 Letter from Defendants' Counsel to Plaintiff's Counsel (ECF No. 28-7), Exhibit HH.

[144] February 12, 2015 Email from Eric Quinlan, Esq. of Energi Insurance Services, Inc. to Derek Zambino (ECF No. 28-6), Exhibit DD.

[145] June 25, 2014 Email from Paul Nestor to Stephen Toli (ECF No. 28-6), Exhibit Y.

International Insurance Company of Hannover SE's Motion for Summary

Judgment in its entirety.  The Clerk of Court is directed to close this case.

An appropriate Order follows.




BY THE COURT


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge